# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUSTIN M. DYNLACHT,          :
     *Plaintiff,*           :
                          :
     v.                      :       CIVIL ACTION NO. 25-CV-5277
                          :
DR. RALPH LAUGHINGWELL, *et al.*,  :
     *Defendants.*         :

## MEMORANDUM

**Pappert, J.**                                    **October 29, 2025**

Justin Dynlacht filed this lawsuit pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),[1] alleging violation of his constitutional rights, specifically denial of adequate medical care while housed as a pretrial detainee at the Federal Detention Center in Philadelphia.[2]  For the following reasons, the Court dismisses the Complaint because there is no *Bivens* remedy available.

---

[1] "[A]ctions brought directly under the Constitution against federal officials have become known as '*Bivens* actions.'"  *Vanderklok v. United States*, 868 F.3d 189, 198 (3d Cir. 2017).

[2] Dynlacht filed suit on August 31, 2025, when he was a pretrial detainee.  (*See* ECF No. 2 at 4, 11.)  The docket for Dynlacht's federal criminal case reflects that he pled guilty to one count of stalking in violation of 18 U.S.C. § 2261A(2) on March 19, 2025, but has not yet been sentenced.  *See United States v. Dynlacht*, Crim. A. No. 24-0063 (D. Del.) (ECF No. 48); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (the court may consider matters of public record).

## I[3]

Dynlacht has been detained at FDC since May 8, 2024, when he was arrested in connection with *United States v. Dynlacht*, Crim. A. No. 24-0063 (D. Del.).  (Compl. at 5, 13.)  He sued FDC Clinical Director Dr. Ralph Laughingwell; FDC Dr. Aaron Weaver; Interim Warden M. Washington; Warden J. L. Jamison; Colette Peters, former Director of the Bureau of Prisons; the "National Director of the United States Marshals Service from May 2024 to January 2025"; and NaphCare.  (*Id.* at 1-3, 12.)

Dynlacht contends that from May 8, 2024 until the filing of the Complaint, he was denied "suitable medical care, diagnostic testing and medications," resulting in a deterioration of his health.  (*Id.* at 4, 5.)  The Complaint's gravamen is that "FBOP medical and administrative personnel came up with one false excuse after another to delay properly treating . . . [his] chronic health problems" to coerce him into accepting a plea deal in his federal criminal prosecution.  (*Id.* at 16; *see also id.* at 5, 13.)

Throughout the Complaint, Dynlacht describes in great detail his sixteen chronic medical conditions,[4] as well as the treatment he had been prescribed, and the

---

[3] The following allegations are taken from Dynlacht's Complaint.  (ECF No. 2 at 1-35.)  The Complaint consists of the court's standard form for use by prisoners filing a complaint for violation of civil rights and a type-written supplement (*id.* at 1-11, 13-23), as well as several attachments, including:  list of Defendants (*id.* at 12); list of current medical conditions (*id.* at 27); June 18, 2025 letter from Dynlacht to William K. Marshall, III, detailing the steps taken in the administrative review process (*id.* at 24-26); "Rejection Notice – Administrative Remedy" dated March 20, 2025 (*id.* at 28); letter from Dynlacht to Sentencing Judge dated July 28, 2025 (*id.* at 29); "Request to Staff" dated May 6, 2025 (*id.* at 30); "Request to Staff" dated April 16, 2025 (*id.* at 31); "Central Office Administrative Remedy Appeal" dated March 10, 2025 (*id.* at 32); and Administrative Remedy Response by Interim Warden Washington dated December 23, 2024 (*id.* at 33-35).  The Court adopts the sequential pagination supplied to Dynlacht's submission by the CM/ECF docketing system.

[4] Dynlacht lists the following medical conditions: (1) steroid-dependent severe Crohn's disease with three complications; (2) dysplastic nevus syndrome, congenital; (3) anxiety, depression, and insomnia; (4) pre-diabetes; (5) steroid-induced cataracts in both

treatment he preferred, at the time he was taken into federal custody.  (*See id.* at 13-21, 27.)  For example, Dynlacht contends that his treatment for Crohn's disease "requires both Stelara 90 mg PFS Prefilled syringe every 8 weeks and daily doses of 2.4 grams of Mesalamine (Delzicol formulation which are four small tablets contained within a capsule)," as well as "monitoring with a colonoscopy and abdominal/pelvic Magnetic Resonance Enterography (MRE) every 3 years."  (*Id.* at 13.)  According to Dynlacht, he has not received proper care or testing for any of his conditions other than anxiety, depression, and insomnia, and high cholesterol during his time at FDC.  (*See id.* at 27.) He further contends that BOP staff at the local, regional, and national level were "extremely unprofessional and uncooperative" and rejected his grievance appeals related to inadequate medical care for trivial reasons to avoid this lawsuit.  (*Id.* at 7.)

Dynlacht alleges that he provided a list of his sixteen chronic conditions, including "steroid dependent severe Crohn's disease with three complications" which he describes as "one of the most complex and serious conditions," to the United States Marshals Service when he was taken into custody, and to Nurse Breen upon intake at FDC.  (*Id.* at 13.)  At that time, Dynlacht was taking six prescription medications, as well as three additional over the counter medications, for his various conditions.  (*Id.*) He avers that BOP medical personnel did not permit him to retain personal medications upon intake into the FDC and Laughingwell and Weaver refused to write prescriptions for six of the nine prescription and OTC medications that he required,

---

eyes; (6) steroid-induced cardiovascular disease and symptoms including hypertension, tachycardia, palpitations, murmur and a dilated aorta; (7) right inguinal hernia and umbilical hernia; (8) history of malignant skin lesions; (9) rosacea of the face and seborrhea dermatitis of the scalp; (10) gallbladder disease suspected; (11) high cholesterol; (12) androgenic alopecia of the scalp; (13) suspected osteoporosis; (14) immunosuppression due to Crohn's disease; (15) diverticulosis; and (16) gum disease.  (*See* Compl. at 27.)

even after the BOP eventually received his medical records from his medical providers. (*Id.*)  For example, he alleges that Dr. Laughingwell changed the mesalamine formulation to a generic, which Dynlacht contends he did not absorb properly.  (*Id.*)

From the time of his intake into FDC, Dynlacht sought to continue the same prescription and OTC medication and treatment that he had received prior to his incarceration.  Because that did not happen, Dynlacht filed an informal resolution attempt with his Unit Counselor at FDC on July 23, 2024, and followed up with him each week until he received a response from his Unit Manager on September 25, 2024. (*Id.* at 7, 13.)

As a result of his requests, Dynlacht was scheduled for appointments with a gastroenterologist and a dermatologist at Jefferson Health.  (*Id.* at 13.)  However, the appointments were cancelled on several occasions and had to be rescheduled.  (*Id.* at 13-14.)  Dynlacht asserts that the cancelled Jefferson Health appointments were due to intentional acts of BOP medical staff and NaphCare personnel to coerce him into pleading guilty.  (*Id.* at 16.)[5]

_____

[5] Attached to the Complaint is Interim Warden Washington's December 23, 2024 Response to Dynlacht's request for an administrative remedy in which Dynlacht alleged that personnel at FDC made the conscious decision to violate his constitutional rights.  (*See* Compl. at 33-35.)  The Response details the steps taken to address Dynlacht's request for treatment of Crohn's disease and the attempts to obtain treatment from a provider outside FDC.

It indicates that Dynlacht was evaluated by a nurse on intake on May 8, 2024, during which Dynlacht reported his chronic issues, including the treatment he received for Crohn's disease.  (*Id.* at 33.)  The intake screening was cosigned by the Clinical Director who reviewed the note the following business day and continued the prescription for Mesalamine.  (*Id.*)  Dynlacht was placed on the schedule for initial chronic care and to discuss the Stelara injection.  (*Id.*)  On May 24, Dynlacht was evaluated by the Clinical Director for the initial chronic care appointment.  (*Id.*)  Because Stelara, a nonformulary medication, required more information to obtain approval to prescribe it, Dynlacht was asked to consent to the BOP obtaining his outside medical records.  (*Id.*)  Once they were received, Dynlacht was to be referred to a local gastroenterologist.  (*Id.*)  On June 2, the

Dynlacht had a gastroenterology consultation on October 31, 2024 and a dermatology consultation on November 5, 2024.[6]  (*Id.* at 14.)  Dynlacht states his conditions worsened while he awaited those appointments.  (*Id.*)  With respect to treatment for Crohn's disease specifically, Dynlacht claims he missed doses of Stelara on June 1, 2024, August 1, 2024, October 1, 2024, and December 1, 2024, resulting in the Crohn's disease no longer being in remission.  (*Id.* at 13, 14.)  On January 22, 2025,

medical records were reviewed by the Clinical Director and a request for gastroenterology was submitted.  (*Id.* at 34.)  On June 12, the consultation request was approved by the Utilization Review Committee.  (*Id.*)  On June 14, the approved consultation was submitted to NaphCare for scheduling with Jefferson Gastroenterology Hepatology Associates.  (*Id.*)

On June 25, the Jefferson office provided an appointment date of December 31.  (*Id.*)  FDC personnel subsequently notified NaphCare that Dynlacht required an earlier appointment.  (*Id.*)  On July 22, Dynlacht submitted a sick call for a "Crohn's flare up" and was seen in a sick call on July 31.  (*Id.*)  At that time, FDC medical staff attempted to get non-formulary approval for the Stelara injection and the request was referred to the Health Services Division, Central Office, for review.  (*Id.*)  The referral was deferred with the advisement to first try formulary medications.  (*Id.*)  On August 9, the appointment was moved up to November 18, but FDC notified NaphCare that Dynlacht was still in need of an earlier appointment.  (*Id.*)  On August 12, the appointment was moved up to September 16, but the appointment was cancelled because the gastroenterologist was out sick that day.  (*Id.*)  It was rescheduled to October 3 but was again cancelled due to unavailability of the gastroenterologist.  (*Id.*)  It was rescheduled to October 31.  (*Id.*)  The appointment finally took place on October 30.  (*Id.* at 35.)  The gastroenterologist's report was sent to FDC on November 13 and was reviewed by the Clinical Director, who submitted a consultation request to start "Ustekinumab infusion, then continue with subcutaneous formulation (Stelara)."  (*Id.*)  The request was approved the following day and immediately submitted to NaphCare for scheduling.  (*Id.*)

On December 6, Dynlacht was evaluated by the Medical Officer for the chronic care clinic.  (*Id.*)  During the exam, the Medical Officer noted that the infusion appointment was still "pending scheduling."  (*Id.*)  At that time, Dynlacht reported having increased gas, but denied abdominal pain, nausea, vomiting, diarrhea, bloody stools, or constipation.  (*Id.*)  His weight was steady.  (*Id.*)  He was advised to follow up with sick call as needed.  (*Id.*)  On December 13, FDC personnel contacted NaphCare to inquire about the infusion appointment and NaphCare responded that the gastroenterologist never entered the order for the infusion.  (*Id.*)  NaphCare advised that they would follow up with the gastroenterology office.  (*Id.*)

[6] During the relevant period, Dynlacht received care from Jefferson Health gastroenterology and dermatology providers, including in October and November 2024, and May and June 2025.  (Compl. at 14-15.)  He also had an MRI on August 27, 2025.  (*Id.* at 15.)

Dynlacht received a Stelara infusion at Jefferson Health and later a subcutaneous injection of the medication on March 19, 2025.  (*Id.* at 17.)  In May 2025, Dr. Laughingwell ordered the prescription changed to "Yesintek, the approved biosimilar medication to Johnson & Johnson's Stelara."  (*Id.*)  Dynlacht alleges that Yesintek does not relieve his Crohn's symptoms and his condition flared up again due to the change in medication.  (*Id.*)

Dynlacht asserts that Drs. Laughingwell and Weaver provide substandard care to, and intentionally withhold care from, inmates at FDC.  (*See generally id.* at 13-22.)  For example, Dynlacht contends that Laughingwell and Weaver delayed prescribing the medications Dynlacht sought because the medications were considered nonformulary drugs by the BOP.  (*Id.* at 14.)  However, Dynlacht contends that FDC should have been able to obtain them inexpensively.  (*Id.* at 14, 16.)  He further alleges that the Drs. Laughingwell and Weaver falsified his medical records by failing to document reported symptoms, deleted treatment notes from Jefferson Health providers, and refused to provide the medication, testing, and treatment prescribed by the outside providers.  (*Id.* at 14-15, 17.)  Additionally, Dynlacht alleges he was not provided with supplements that he required, including vitamin B and calcium, and was forced to purchase them through the commissary.  (*Id.* at 16.)  He further claims that sick calls were disregarded, which he says has been an ongoing problem since May 2024.  (*Id.* at 16, 19.)

Dynlacht also alleges that he is immunosuppressed because he has been taking medication for Crohn's disease for thirty years.  (*Id.* at 16.)  As a result, he is susceptible to skin, respiratory, and gastrointestinal infections, from which he has

suffered "continuous[ly]" since his incarceration at FDC. (*Id.*) He contends that the "deplorable" conditions at FDC exacerbate each of his sixteen chronic conditions. (*See id.*) Dynlacht also alleges that BOP officials retaliated against him for exercising his First Amendment rights by suspending his commissary, visitation, and good time privileges. (*Id.*)

Dynlacht presents numerous allegations regarding the BOP's "dysfunctional and corrupt" Administrative Remedy Program ("ARP") (*see generally id.* at 13-22), and refers to the June 18, 2025 letter to William K. Marshall, III, Director of the BOP, which he attached to the Complaint. (*Id.* at 19, 24-26.) Dynlacht's letter describes the administrative steps he took regarding his claims of inattention to his medical needs. (*See id.* at 24-26.) He first attempted an informal resolution on July 23, 2024, but did not receive a response until September 2024. (*Id.* at 24.) He then filed a complaint directly with the Northeast Regional FBOP Director because he feared retaliation from FDC officials, which was rejected. (*Id.*) Next, Dynlacht filed a BP-9 with Interim Warden M. Washington on December 4, 2024, addressing the alleged inadequate medical care. (*Id.* at 7, 24.) Interim Warden Washington's BP-9 response is dated December 23, 2024, but Dynlacht claims he did not receive it until January 8, 2025, because Washington "sat on" it. (*Id.* at 16, 24.) Because Dynlacht's unit was on lockdown at that time, he sent his appeal of Interim Warden Washington's denial to the Northeast Regional BOP office on January 10, 2025. (*Id.* at 7, 16, 24.) According to Dynlacht, this appeal and every subsequent appeal were rejected for trivial reasons, including being untimely, which he claims prevented him from obtaining justice through the appeals process. (*Id.* at 17, 24, 25.) He claims that BOP staff do not

actually review the content of inmate appeals and simply reject them for trivial reasons.  (*See id.* at 16-17.)  He further claims that "none of the timing deviations" were his fault, he abided by the required timelines of the grievance and appeals process, and attempted to obtain a memorandum explaining the cause for the delay as required by the BOP's ARP.  (*Id.* at 17, 25.)  Ultimately, Dynlacht contends that the administrative appeals process was exhausted on May 11 or 15, 2025 when he received the last rejection of his appeal.  (*Id.* at 17, 25.)

Based on the allegations in his Complaint, Dynlacht claims that his First and Eighth Amendment rights were violated, resulting in physical and psychological harm. (Compl. at 4, 19-22.)  As relief, he seeks his release from custody, an investigation into the actions of Drs. Laughingwell and Weaver, as well as monetary damages.[7]  (*Id.* at 19-22.)

## II

The Court will grant Dynlacht leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action. Accordingly, 28 U.S.C. § 1915(e)(2)(B) requires the Court to dismiss the Complaint if, among other things, it fails to state a claim.  Whether a complaint fails to state a claim

---

[7] The discussion below focuses on whether Dynlacht has stated *Bivens* claims for damages.  To the extent Dynlacht seeks release from custody, the Court cannot grant such relief.  A federal pretrial detainee challenging the validity of charges and pretrial detention in a federal criminal case must raise such claims in a motion in the federal criminal case. *See Reese v. Warden Philadelphia FDC*, 904 F.3d 244, 247 (3d Cir. 2018).  To the extent that Dynlacht requests an investigation by Inspector General Michael Horowitz into the actions of Drs. Laughingwell and Weaver, the Court cannot order that either.  *See Nicholas v. Heffner*, 228 F. App'x 139, 141 (3d Cir. 2007) (*per curiam*) ("The District Court correctly denied injunctive relief.  The remaining relief requested is not available as the District Court lacks authority to order a federal investigation and prosecution of the defendants or the termination of their employment.").

under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021). At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether the complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678. As Dynlacht is proceeding *pro se*, the Court construes his allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

### III

*Bivens* provides a judicially recognized damages remedy for constitutional violations committed by federal actors in highly limited circumstances. *Egbert v. Boule*, 596 U.S. 482, 486 (2022); *Ziglar v. Abbasi*, 582 U.S. 120, 130-31 (2017). The United States Supreme Court has recognized an implied private action against federal officials in only three cases: (1) *Bivens* itself, which recognized an implied cause of action for violation of the Fourth Amendment's right against unreasonable searches and seizures; (2) *Davis v. Passman*, 442 U.S. 228 (1979), which recognized a claim for gender discrimination in the employment context under the Fifth Amendment's Due Process

Clause; and (3) *Carlson v. Green*, 446 U.S. 14 (1980), which recognized a claim against prison officials for inadequate medical care in the prison context under the Eighth Amendment. *See Dongarra v. Smith*, 27 F.4th 174, 180 (3d Cir. 2022); *see also Abbasi*, 582 U.S. at 131 ("These three cases - *Bivens*, *Davis*, and *Carlson* - represent the only instances in which the [Supreme] Court has approved of an implied damages remedy under the Constitution itself."). Since 1980, the Supreme Court has declined more than ten times to extend *Bivens* to cover other constitutional violations. *Goldey v. Fields*, 606 U.S. 942, 942 (2025) (*per curiam*). These cases "have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Id.* at 942-43 (internal quotation omitted); *see also Xi v. Haugen*, 68 F.4th 824, 832 (3d Cir. 2023) ("In the fifty-two years since *Bivens* was decided, . . . the Supreme Court has pulled back the reins to what appears to be a full stop and no farther.").

"To determine whether a *Bivens* claim may proceed, the [Supreme] Court has applied a two-step test." *Goldey*, 606 U.S. at 944. "First, [courts] ask whether the 'case presents a new *Bivens* context'—*i.e.*, whether the 'case is different in a meaningful way from previous *Bivens* cases decided by' the Supreme Court"—using only *Bivens*, *Davis*, and *Carlson* as a benchmark as well as a "broad" understanding of what constitutes a new context. *Kalu v. Spaulding*, 113 F.4th 311, 326 (3d Cir. 2024) (quoting *Abbasi*, 582 U.S. at 139). The non-exclusive list of factors to consider here includes:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* (quoting *Abbasi*, 582 U.S. at 139-40). "Whether a context is new is an 'easily satisfied' test because 'a modest extension of the *Bivens* action is still an extension[,]'" meaning "[e]ven 'significant parallels to one of the Supreme Court's previous *Bivens* cases' may not be enough." *Henry v. Essex Cnty.*, 113 F.4th 355, 361 (3d Cir. 2024) (cleaned up) (quoting *Abbasi*, 582 U.S. at 147-49); *Fisher*, 115 F.4th at 206 ("[A] case can differ meaningfully from *Bivens, Davis,* and *Carlson* even when it involves the same constitutional right as one of those cases.").

If the context is new, courts proceed to the second step of the inquiry, which asks whether there are special factors indicating that "the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Goldey*, 606 U.S. at 944 (cleaned up) (citing *Egbert*, 596 U.S. at 492). This analysis is "anchored in separation-of-powers principles." *Id.* (citing *Abassi*, 582 U.S. at 135). In *Egbert*, the Supreme Court observed that the two-part test "often resolve[s] to a single question" of "whether there is any reason to think that Congress might be better equipped to create a damages remedy." 596 U.S. at 492; *see also Muniz v. United States*, 149 F.4th 256, 261 (3d Cir. 2025) ("[I]n *Egbert v. Boule*, the Supreme Court clarified that a new context arises even under the first step when potential special factors that previous *Bivens* cases did not consider are presented and those factors counsel hesitation -- extending a step-two-like special factors analysis to the first step.") (internal quotations and citations omitted). The United States Court of Appeals for the Third Circuit distilled *Egbert* to require the following: "unless a case is indistinguishable from *Bivens, Davis,* or *Carlson*, a damages remedy may be created by Congress, but not by the courts." *Fisher*, 115 F.4th at 205.

11

A

Dynlacht alleges that Defendants failed to provide him adequate medical treatment in violation of his Eighth Amendment rights.  In considering whether Dynlacht's claims present a new context, *Carlson* is most relevant.  *Carlson* involved constitutional claims brought by a prisoner's estate against federal prison officials for failure to provide adequate medical treatment leading to the prisoner's death.  446 U.S. at 17 n.1.  The complaint in *Carlson* alleged that prison officials:

> being fully apprised of the gross inadequacy of medical facilities and staff at the Federal Correction Center in Terre Haute, Ind., and of the seriousness of [the prisoner's] chronic asthmatic condition, nonetheless kept him in that facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital.  The complaint further alleges that [the prisoner's] death resulted from these acts and omissions, that petitioners were deliberately indifferent to [his] serious medical needs, and that their indifference was in part attributable to racial prejudice.

446 U.S. at 17 n.1.  The *Carlson* court "held that the Eighth Amendment Cruel and Unusual Punishments Clause gave [the prisoner's estate] a damages remedy for failure to provide adequate medical treatment."  *Abbasi*, 582 U.S. at 131.

Several of the *Abbasi* factors proffer meaningful differences between Dynlacht's claims and *Carlson*.  Notably, *Carlson* involved a claim arising under the Eighth Amendment.  Although Dynlacht asserts that his claims are based on the Eighth Amendment, the Fifth Amendment applies here because he was a pretrial detainee held in a detention center during the events giving rise to his claims.  *See Bell v. Wolfish*, 441 U.S. 520, 530, 541 (1979) (applying the Fifth Amendment to claims challenging conditions of pretrial detention).  The Supreme Court noted this distinction

in the first step of the *Bivens* analysis, ultimately declining to extend *Bivens* to claims

of detainee mistreatment.  *See Abbasi*, 582 U.S. at 148 ("The constitutional right is

different here, since *Carlson* was predicated on the Eighth Amendment and this claim

is predicated on the Fifth.").  As explained by the Court of Appeals for the Ninth

Circuit, constitutional claims presented by pretrial detainees held in detention centers

present a significant difference in setting to those raised by convicted and sentenced

prisoners because:

> Jails are typically smaller than prisons, they are not intended for long-
> term detention, and they house a different class of inmates.  Prisons and
> jails also may involve different levels of risk to inmate safety.  Because of
> these differences, jails and prisons are operated differently.

*Marquez v. C. Rodriguez*, 81 F.4th 1027, 1032 (9th Cir. 2023) (holding that failure to

protect claim brought by a pretrial detainee under the Fifth Amendment was

meaningfully different than *Carlson*); *see also Stanard v. Dy*, 88 F.4th 811, 818 (9th Cir.

2023) ("There is little doubt that Stanard's Fifth Amendment claim [challenging the

quality of medical care he received as a detainee] does present a new context.").  The

Eleventh Circuit Court of Appeals has also concluded that conditions claims raised by a

pretrial detainee, which are governed by a different amendment than those at issue in

*Carlson*, present a new *Bivens* context.  *See Johnson v. Terry*, 119 F.4th 840, 857 (11th

Cir. 2024) ("Johnson's claim based on the medical care he received after being attacked

by Phillip is predicated on a different constitutional right than the one in *Carlson* . . . .

That alone is enough for the claim to present a new context.").

Consistent with these cases and the approach taken by most courts that have

recently considered the issue, the differences between the relevant constitutional

provisions and realities of confinement pertaining to pretrial detainees and those

13

pertaining to convicted and sentenced prisoners present a new *Bivens* context.  *See, e.g.,*
*Lugo v. Fed. Bureau of Prisons*, No. 23-5602, 2025 WL 2396647, at *2 (S.D.N.Y. Aug.
19, 2025) ("*Bivens* does not offer a remedy for Fifth Amendment deliberate indifference
claims."); *German-Andujar v. U.S. Customs & Border Prot.*, No. 24-6190, 2025 WL
1101514, at *4 (W.D.N.Y. Apr. 14, 2025) (dismissing Fifth Amendment medical
deliberate indifference claims brought against border patrol agents as a new *Bivens*
context); *Gould v. Bertoncini*, No. 21-114, 2025 WL 1014712, at *2 (N.D. Ind. Apr. 4,
2025) (finding Fifth Amendment deliberate indifference claims arise under a different
constitutional provision than the Eighth Amendment in *Carlson* and present a new
*Bivens* context); *Iotova v. Quay*, No. 19-1957, 2024 WL 923931, at *11 (E.D.N.Y. Mar. 4,
2024) ("Plaintiffs' allegations related to inadequate health care [under the Fifth
Amendment], while presenting a closer call, also present a new *Bivens* context."), *report
and recommendation adopted as modified*, 2024 WL 1513642 (E.D.N.Y. Apr. 8, 2024);
*McIntyre v. U.S. Marshal Serv.*, No. 18-1268, 2023 WL 2447424, at *4 (D.N.J. Mar. 10,
2023) ("Neither *Bivens* itself, which arose under the Fourth Amendment, nor *Carlson*,
which arose under the Eighth Amendment[], recognized a cause of action for money
damages under the Fifth Amendment," and *Davis*'s recognition of an implied action
under the Fifth Amendment concerned gender discrimination in the employment
context, not matters related to treatment of federal pretrial detainees.).[8]  *But see, e.g.,*

_____

[8] To the extent courts in this Circuit have found the distinction between pretrial
detainees and convicted and sentenced prisoners irrelevant, they have relied on *Bistrian*,
which was subsequently abrogated by *Egbert*, as recognized in *Fisher*.  *See Fisher*, 115
F.4th at 204 ("Defendants respond that *Bistrian* and *Shorter* have been abrogated by the
Supreme Court's later decision in *Egbert v. Boule*.  We agree.  *Egbert* tightened the *Ziglar*
test and, in doing so, made a strong statement that lower courts should not extend *Bivens*
beyond the contexts recognized in *Bivens, Davis,* and *Carlson*."); *Sanders v. Marler*, No. 18-
5477, 2022 WL 2703597, at *10 (E.D. Pa. July 12, 2022) ("[A]lthough *Carlson* recognized a

*Watkins v. Mohan*, 144 F.4th 926, 938 (7th Cir. 2025) (allowing pretrial detainee's claim of inadequate medical care to proceed); *Mirvis v. Quay*, No. 19-2573, 2025 WL 2782798, at *4 (E.D.N.Y. Sept. 30, 2025) (recognizing a Fifth Amendment claim for deliberate indifference to a pretrial detainee's serious medical needs under *Bivens*); *Carattini v. Behun*, No. 21-9373, 2024 WL 3274663, at *6 (S.D.N.Y. July 2, 2024) ("[T]he fact that Plaintiff's *Bivens* claim for deliberate indifference to serious medical needs is brought under the Fifth Amendment as opposed to the Eighth Amendment claim recognized in *Carlson* does not mean that the claim arises in a new context.").

Other *Abassi* factors distinguish this case from *Carlson* as well. With regard to the generality or specificity of the official action, the medical circumstances causing the injuries Dynlacht alleges provide a meaningful difference to suggest this case arises in a new context from *Carlson*. In *Carlson*, prison officials failed to provide and/or delayed treatment after the prisoner suffered from an asthma attack, causing the prisoner's death. *See Carlson*, 446 U.S. at 671. Without denigrating the medical conditions at issue here, the nature and severity of Dynlacht's alleged injuries differ meaningfully from that in *Carlson*. *See Johnson*, 119 F.4th at 859 (considering the severity, type, and treatment of the injuries as compared to that of *Carlson*); *see also Waltermeyer v. Hazlewood*, 136 F.4th 361, 366-67 (1st Cir. 2025) (considering same). For example, Dynlacht repeatedly describes the nature of his medical conditions as chronic, as

---

*Bivens* claim under the Eighth Amendment and Mr. Sanders' claim for deliberate indifference arises under the Fifth Amendment because he was a pretrial detainee, I conclude that this case does not present a new *Bivens* context" based on *Bistrian*); *see also Bistrian v. Levi*, No. 08-3010, 2023 WL 6927327, at *10 (E.D. Pa. Oct. 19, 2023) ("This Court is bound by *Bistrian II*—the Third Circuit's directive in this case—and subsequent cases."). These courts also did not have the benefit of *Goldey* and the Third Circuit's recent decisions in *Muniz*, *Fisher,* and *Kalu* which limited and clarified *Bivens*'s application in the context of claims challenging prison conditions.

opposed to requiring the emergent treatment at issue in *Carlson*.  (*See* Compl. at 5, 7, 13, 17, 19.)  *See also Pinson v. United States*, No. 17-0584, 2025 WL 2446292, at *4-5 (M.D. Pa. Aug. 25, 2025) ("[T]he provision of chronic medical care is a specialized activity requiring a high degree of training and qualification, which courts are ill-equipped to regulate, particularly in the prison context.") (internal quotations and citations omitted); *but see Schwartz v. Miller*, 153 F.4th 918, 931 (9th Cir. 2025) (chronic nature of medical issues can support a *Carlson* action).  In terms of the severity of the alleged injuries, the Court understands Dynlacht to primarily allege "blood in [his] stool, constipation, pain, weight loss, extreme gas (both flatulence and belching, insomnia," "respiratory and gastrointestinal infections," "higher risk of [skin] malignancies," increased "dry scalp & skin and rosacea leading to "uncontrolled suborrhea/scaling of [the] face and scalp . . . [causing] unbearable itching," as well as hair loss.  (*See, e.g.,* Compl. at 14, 16, 17, 20.)  Again, the Court must determine whether this case is different in a "meaningful" way such that Congress might doubt the efficacy or necessity of a damages remedy in *this* context.  *See Muniz*, 149 F.4th at 262-63.  That standard is met here.  *Compare Muniz*, 149 F.4th at 262 (finding that denial of adequate medical care resulting in amputation of toe was not meaningfully different from *Carlson* because both plaintiffs alleged denial of adequate care causing flare-ups of medical conditions, and necessitating a hospital visit and emergency medical treatment); *with Livingston v. United States*, No. 24-4489, 2025 WL 2689596, at *5 (E.D.N.Y. Sept. 19, 2025) ("[T]he fact that plaintiff did not die while waiting for medical treatment, did eventually receive adequate medical treatment, and did not die from that medical treatment meaningfully distinguishes this case from *Carlson*.") *and*

*Wardlow v. Tomar*, No. 24-158, 2025 WL 2621547, at *5 (E.D. Ark. Aug. 4, 2025)

("[B]ecause this case involves [plaintiff's] long-term, non-emergent care, . . . the facts

here vary substantially from *Carlson* and present a new *Bivens* context."), *report and*

*recommendation adopted*, No. 24-158, 2025 WL 2617687 (E.D. Ark. Sept. 10, 2025). *See*

*also Pinson,* 2025 WL 2446292, at *4-5 ("[T]he refusal to provide a specific kind of

surgery during Pinson's roughly four-month stay at USP Allenwood, although

distressing to Pinson, is not analogous to *Carlson*, which involved the total absence of

competent medical care in response to an apparent emergency." (internal quotations

omitted)).  The similarities between the medical circumstances of Dynlacht's claims and

the deliberate indifference claim at issue in *Carlson* are not enough to support a

judicially-created cause of action.

Additionally, the passage of the Prison Litigation Reform Act and the existence

of the BOP's ARP, both of which post-date *Carlson*, are special factors that render

Dynlacht's claims a new context because they were not considered by the Supreme

Court.  *Johnson*, 119 F.4th at 858 ("[W]e find that the context of these claims is

different from the context of the claim in *Carlson* because there the Court did not

consider whether there were alternative remedies under the current alternative remedy

analysis."); *Muniz*, 149 F.4th at 264  ("Since the BOP ARP did not factor into the

Supreme Court's remedial analysis in *Carlson*, the availability of that mechanism to

Muniz creates a new context at the first step."); *Kalu*, 113 F.4th at 328 ("Because the

PLRA and the BOP's remedy program are 'features that were not considered' by the

Supreme Court when it decided *Carlson*, they present an additional reason to conclude

that Kalu's claim arises in a new context." (quoting *Abbasi*, 582 U.S. at 148)).

Thus, Dynlacht's claims are not indistinguishable from those at issue in *Carlson* and present a new *Bivens* context. *See Fisher*, 115 F.4th at 205 ("[U]nless a case is indistinguishable from *Bivens*, *Davis*, or *Carlson*, a damages remedy may be created by Congress, but not by the courts."); *see also Jordan v. Barves*, No. 24-2030, 2024 WL 4579248, at *2 (3d Cir. Oct. 25, 2024) (*per curiam*) ("As this Court recently explained in applying *Egbert*, *Bivens* actions are cognizable only when the claim presented is "indistinguishable" from a previously-recognized *Bivens* context." (citing *Fisher*, 115 F.4th at 205)).

B

At the second step of the *Bivens* analysis, the Court must consider whether special factors preclude the extension of a *Bivens* remedy to Dynlacht's claims. The Third Circuit Court of Appeals has held that the existence of the BOP's ARP "precludes a *Bivens* remedy." *Fisher*, 115 F.4th at 208. More recently, the Third Circuit clarified, "[i]n addition to creating a new context at step one, the BOP ARP forecloses the need to fashion a new, judicially crafted cause of action at the second step as well." *Muniz*, 149 F.4th at 264 (cleaned up). The Circuit noted that the "effectiveness of the BOP ARP is, at best, dubious." *Id.* However, the Circuit explained:

> [I]n the step-two *Bivens* analysis, alternative remedies need not "provide complete relief." *Egbert*, 596 U.S. at 493 (quoting *Bush v. Lucas*, 462 U.S. 367, 388 (1983)). The Court's jurisprudence cautions against the judiciary weighing the adequacy of alternative relief established by the political branches. *See Goldey*, [606 U.S. at 945-45]. Rather, so long as "Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure," *Egbert*, 596 U.S. at 493 (quotation omitted), then "bedrock principles of separation of powers foreclose[ ] judicial imposition of a new substantive liability," [*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001)].

Thus, at the second step, the availability of the BOP ARP is a "special factor[ ]" suggesting that a damages remedy "risk[s] . . . interfering with the authority of the other branches." *Hernandez*, 589 U.S. at 102. And this reason to hesitate, alone, forecloses *Bivens* relief. *See Egbert*, 596 U.S. at 496.

*Id.* at 264-65. The Circuit concluded that Muniz's *Bivens* claim failed because an alternative remedy existed and was made available to him. Similarly, the availability of the BOP ARP to Dynlacht is a special factor that precludes the extension of *Bivens* to his claims.[9]

---

[9] In *Muniz*, the Circuit suggested that *Carlson* relief remains available to inmates in limited circumstances, such as where prison administrators thwart inmates from taking advantage of the BOP ARP and render the administrative process unavailable as a remedy. *See Muniz*, 149 F.4th at 265 (citing *Ross v. Blake*, 578 U.S. 632, 644 (2016)). Here, Dynlacht repeatedly alleges that the BOP ARP is "dysfunctional and corrupt" and that his grievances and appeals were denied for trivial reasons. (*See, e.g.*, Compl. at 19.) The alleged failure to achieve a positive result in the administrative process for Dynlacht does not impact the *Bivens* analysis, however, given the general existence of the program at the facility and his, albeit unsuccessful, utilization of the process. Indeed, the *Goldey* Court recently considered an extension of *Bivens* in the context of an Eighth Amendment claim for excessive force and reasoned that such an extension "could have negative systemic consequences for prison officials and the 'inordinately difficult undertaking' of running a prison." 606 U.S. at 944 (quoting *Turner v. Safley*, 482 U.S. 78, 84-85 (1987)). The Court reiterated that the existence of an alternative remedial structure for aggrieved federal prisoners "counsels against allowing *Bivens* suits even if such 'procedures are not as effective as an individual damages remedy.'" *Id.* at 944-45 (quoting *Egbert*, 596 U.S. at 498); *see also Egbert*, 596 U.S. at 493 ("If there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." (quotations omitted)); *Kalu*, 113 F.4th at 333 (explaining that the "presence of an alternative remedial structure" precludes application of *Bivens* even if the remedies are not as effective as a damages remedy, and that BOP's administrative remedial structure was a special factor counselling against a *Bivens* extension where inmate unsuccessfully attempted to use the program). In a recent non-precedential opinion, the Third Circuit considered an inmate's allegation that prison officials had thwarted his attempts to use the BOP ARP by failing to provide him with necessary grievance forms and legal papers. *See Fields v. Fed. Bureau of Prisons*, No. 24-2329, 2025 WL 2409060, at *2 (3d Cir. Aug. 20, 2025) (*per curiam*). The Circuit found that the existence of an alternative remedial structure counselled against extending *Bivens*, even assuming prison employees did not afford the plaintiff adequate opportunities to utilize the prison's grievance system. *Id.* at *3 (citing *Goldey*, 606 U.S. at 944-45; *Egbert*, 596 U.S. at 497-98 ("[W]e have never held that a *Bivens* alternative must afford rights to participation or appeal.").) The Circuit noted that in the special factors analysis, "the focus is not on the individual's recovery at all but rather on the fact that Congress created a

Other special factors also counsel against extending *Bivens*. Relevant here, Congress's "omission of a cause of action against individual officials" in the PLRA suggests that Congress did not intend to create a remedy for constitutional claims beyond *Carlson*. *Kalu*, 113 F.4th at 335-36. Furthermore, "[t]he Supreme Court has long recognized that, because 'the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches,' separation of powers and federalism concerns support conferring 'wide-ranging deference' to prison administrators' policy and operational decisions," which suggests courts are not well suited to fashion remedies in this context. *Id.* at 336.

Accordingly, the Court may not imply a *Bivens* remedy, and Dynlacht may not proceed on his claims. *See Stanard*, 88 F.4th at 813 (affirming dismissal of Fifth Amendment claims alleging detainee's rights "were violated by various federal prison officials when he was denied treatment for Hepatitis C," but reversing dismissal of Eighth Amendment claims based on those allegations); *Livingston*, 2025 WL 2689596, at *6 (dismissing pretrial detainee's claims because the factual circumstances differ significantly from those in *Carlson* and because this case comes under the Fifth Amendment rather than the Eighth, and finding special factors counsel hesitation); *Young v. Williams*, No. 22-0125, 2025 WL 2200735, at *8 (S.D. Cal. Aug. 1, 2025) (finding pretrial detainee's Fifth Amendment medical claim would require extending *Bivens* to a new context and the availability of the BOP ARP is a special factor

---

remedial process that it found sufficient to deter unconstitutional action against prisoners." *Id.* (cleaned up) (citing *Xi*, 68 F.4th at 837); *see also Steele v. Miller*, No. 25-3108, 2025 WL 1755188, at *3 (D. Kan. June 25, 2025) (finding no *Bivens* remedy available to pretrial detainee who brought Fifth Amendment deliberate indifference to medical needs claims and who challenged the effectiveness and practicality of pretrial detainees using the BOP ARP).

counseling hesitation); *Randle v. Gonzalez*, No. 23-96, 2024 WL 1655382, at *2 (N.D.

Ind. Apr. 17, 2024) (dismissing upon screening claims brought by pretrial detainee for,

among other things, lack of medical care: "Randle's claim, while similar to the implied

cause of action recognized in *Carlson*, arises from a different constitutional provision");

*Kaid v. Tatum*, No. 20-3643, 2024 WL 946949, at *10 (S.D.N.Y. Jan. 24, 2024)

(declining to imply *Bivens* remedy for medical claims raised by pretrial detainee and

citing cases), *report and recommendation adopted as modified*, 2024 WL 639331

(S.D.N.Y. Feb. 15, 2024); *see also Bennett v. Washington*, No. 23-0126, 2024 WL

2884573, at *3 (W.D. Ky. June 7, 2024) ("It seems odd that a federal pretrial detainee

who is generally afforded more protection under our Constitution and laws cannot bring

a deliberate-indifference-to-medical-needs claim against a federal officer under *Bivens*,

but a convicted prisoner can.  However, in light of the current United States Supreme

Court and Sixth Circuit case law, the Court must dismiss Plaintiff's Fifth Amendment

deliberate-indifference claim brought under *Bivens* against Defendant Thiel." (citation

omitted)).[10]

---

[10] As noted *supra*, the Due Process Clause of the Fifth Amendment protects pretrial detainees.  *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) (the Due Process Clause of the Fifth Amendment governs conditions of confinement claims brought by pretrial detainees in federal custody).  Because the Court concludes that no *Bivens* remedy is available to Dynlacht's medical claims for damages, the Court need not address whether he has alleged a plausible violation of his Fifth Amendment rights.  Nonetheless, Dynlacht has not alleged a plausible Fifth Amendment claim.  While Fifth Amendment and Eighth Amendment conditions of confinement standards are not necessarily coextensive, they are at least similar.  *See McFadden v. Dalmasi*, 837 F. App'x 135, 136 (3d Cir. 2020) (*per curiam*) (affirming finding of district court that while claims by pretrial detainees are governed by the Fifth Amendment and that the Fifth and Eighth Amendment standards are not necessarily coextensive, the standards are at least similar (citing *Hubbard*, 399 F.3d at 162 n.22, 165-66)).  Whether the Court were to apply an objective reasonableness standard or a deliberate indifference standard, "both standards require the plaintiff to show that the defendant was more than negligent in addressing the plaintiff's serious medical needs."  *Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019); *see generally Bell v.*

IV

_____

*Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process, we think that the proper inquiry is whether those conditions amount to punishment prior to an adjudication of guilt in accordance with law. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *see also Evans v. Columbia Cnty.*, 711 F. Supp. 3d 256, 274 (M.D. Pa. 2024) (noting that the Third Circuit's standard for evaluating a pretrial detainee's claim of inadequate medical treatment under the Fourteenth Amendment's Due Process Clause is not entirely clear and that "in the context of the provision of medical care, there is an open question of how much more protection unconvicted prisoners should receive under the Fourteenth Amendment than convicted prisoners receive under the Eighth Amendment") (internal quotations and citations omitted)). While Dynlacht is dissatisfied with the pace and scope of his treatment, the Third Circuit has long held that allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *see also Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."). Further even assuming *arguendo* that the medical conditions at issue here arise to "serious medical needs," the course of treatment Dynlacht has received for his various conditions contradicts any suggestion that Defendants acted with deliberate indifference to his serious medical needs, much less subjected Dynlacht to "punishment."

Additionally, to the extent that Dynlacht asserts that his conviction was the result of a violation of his Fifth Amendment rights such that he seeks to call into question the validity of his guilty plea, Dynlacht could not proceed on such claim at this time. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that where a claim for money damages "or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" is pursued, a plaintiff "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" (footnote and citation omitted)); *see also Lora-Pena v. F.B.I.*, 529 F.3d 503, 506 n.2 (3d Cir. 2008) (*Heck* analysis applies equally in *Bivens* actions).

To the extent that Dynlacht also seeks to present claims based on retaliation or the general conditions of his confinement at FDC as a pretrial detainee, no *Bivens* remedy exists for these claims either. *See, e.g., Egbert*, 596 U.S. at 498 ("[T]here is no *Bivens* cause of action for Boule's First Amendment retaliation claim."); *Kalu*, 113 F.4th at 327-41 (no *Bivens* remedy for prisoner's Eighth Amendment claims based on inhumane conditions of confinement).

For the foregoing reasons, the Court will dismiss the Complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Dynlacht will not be given leave to amend because he cannot cure the deficiencies in his claims.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002) (stating that complaints should be denied with leave to amend "unless amendment would be inequitable or futile").

An Order follows, which shall be docketed separately.

**BY THE COURT:**

*/s/ Gerald J. Pappert*
**GERALD J. PAPPERT, J.**